UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **SARAH CORSO, Individually and as the natural parent and next friend of John Doe, her minor child,** | : | **Case No.**   1:18-cv-692 |
| | : | |
| | : | |
| **and** | : | **Judge** |
| | : | |
| **IAN DENNY, Individually and as the natural parent and next friend of John Doe, his minor child,** | : | |
| | : | |
| | : | |
| **and** | : | |
| | : | |
| **JOHN DOE, a Minor,** | : | **COMPLAINT AND JURY DEMAND** |
| **c/o Gerhardstein & Branch Co. LPA** | : | |
| **441 Vine Street, Suite 3400** | : | |
| **Cincinnati, Ohio 45202** | : | |
| Plaintiffs, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **HAMILTON COUNTY, OHIO and the** | : | |
| **Hamilton County Board of Commissioners** | : | |
| **c/o Todd Portune, President** | : | |
| **138 East Court Street, Room 603** | : | |
| **Cincinnati, OH 45202** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JOY K. SWING** | : | |
| **c/o Hamilton County Job & Family** | : | |
| **Services** | : | |
| **222 East Central Parkway** | : | |
| **Cincinnati, OH 45202** | : | |
| *Individually and in her Official Capacity as* | : | |
| *a Children's Services Supervisor for* | : | |
| *Hamilton County Job & Family Services* | : | |
| | : | |
| Defendants. | : | |

## I.    INTRODUCTION

1.      This case challenges the unlawful removal of a child from his family home for 76 days

based on lies by a government official.  On October 4, 2016, Sarah Corso and her partner Ian

1

Denny took their infant child, Johnny, to his six-month checkup at his regular pediatrician's office. During the exam, Sarah and Ian relayed concerns about bruising on Johnny's upper arms to the Nurse Practitioner conducting the examination. The Nurse Practitioner reported the bruising to the Hamilton County Job and Family Services so they could investigate and make sure that Johnny was safe, was not being neglected, and was not being abused.

2.      Hamilton County Job and Family Services is chartered to administer state, federal and local programs designed to help those in need and help families work towards self-sufficiency.

3.      Instead of attempting to determine whether Johnny was in actual danger of child abuse in good faith, employees of Hamilton County Job and Family Services ignored obvious evidence that Johnny was being raised in a healthy, loving environment and instead lied to the court, misrepresented exculpatory medical findings, and submitted false testimony in order to convince a judge to remove Johnny. As a direct result of these wrongful and unlawful acts, Johnny was taken away from his loving parents for several months while his parents fought to have their son returned to them; months that the family will never be able to get back.

4.      After a hearing, the juvenile court magistrate returned Johnny to his parents and dismissed the case because there was no support for the accusations of abuse.

5.      Plaintiffs now bring this case seeking fair compensation for the deprivation of their constitutionally protected rights and other injuries and to prevent Defendants from engaging in such wrongful conduct in the future.

## II.      <u>CLAIMS AND JURISDICTION</u>

6.      Jurisdiction over the federal civil rights claim is conferred on this Court by 28 U.S.C. § § 1331 and 1343(a)(3) and (4). Supplemental jurisdiction over the state law claims is conferred by 28 U.S.C. § 1367(a).

2

7.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391.

8.     Plaintiffs' prayer for relief regarding costs, including reasonable attorneys' fees, is authorized by 42 U.S.C. § 1988.

### III.     PARTIES

9.     Plaintiff Sarah Corso is the mother of John Doe.  She is a resident of Hamilton County. She sues on her own behalf and on behalf of her minor son, John Doe.

10.    Plaintiff Ian Denny is the father of John Doe.  He is a resident of Hamilton County.  He sues on his own behalf and on behalf of his minor son John Doe.

11.    Plaintiff John Doe ("Johnny") is a minor and is the natural child of Sarah Corso and Ian Denny. He is a resident of Hamilton County.

12.    Defendant Hamilton County is a political subdivision capable of suing and being sued under the law of Ohio.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.  The Children's Services division of Hamilton County Job and Family Services is one piece of the county's larger child protection system.

13.    Defendant Joy K. Swing was at all times relevant to this action a Children's Services Supervisor for HCJFS.  Defendant Swing is a licensed Social Worker in Ohio. Defendant Swing was at all times relevant to this action Children's Services worker Christopher Beery's supervisor. Defendant Swing is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Swing is sued individually and in her official capacity as an employee of Hamilton County.

### IV.     STATEMENT OF FACTS APPLICABLE TO ALL CLAIMS

14.    Johnny was born on March 16, 2016 in Cincinnati, Ohio.

3

15.     Sarah Corso, age 19 at Johnny's birth, stayed home during the days to take care of Johnny while Ian Denny, age 19 at Johnny's birth, worked to provide for the family.

16.     They lived together with Sarah's parents, including her mother, a sheriff's deputy, in a loving and supportive environment.

### A. Sarah and Ian Took Johnny to his Sixth Month Well Check at the Pediatrician's Office

17.     On October 4, 2016, Johnny's parents, Sarah and Ian, took him to his six-month checkup at his regular pediatrician's office.

18.     While there, Sarah and Ian relayed concerns about small bruises on Johnny's upper arms to a Nurse Practitioner ("N.P.").[1]  The bruises were small faint semi-circles above the elbow. They were the same on both arms, in shape and placement, and were too regularly shaped to have been inflicted by a person or animal.  The parents questioned if the bruises might have been caused by Johnny getting his arms caught in the slats of his crib.

19.     The N.P. left the examination room and unknown to Sarah and Ian, called HCJFS's child protection hotline.

20.     After about an hour the N.P returned to the examination room and Sarah and Ian were told to take Johnny to Cincinnati Children's Hospital Medical Center ("CCHMC") to get bloodwork taken in order to test Johnny for potential blood disorders.  The N.P. declined to give Johnny his immunizations until the bloodwork was done.

21.      Sarah and Ian were suspicious about the veracity of the need for bloodwork, but nevertheless scheduled an appointment at another pediatrician's office to get Johnny's bloodwork drawn and to complete his immunizations.  The appointment was scheduled for October 6, 2016, at 3:15 pm.

---

[1] Photographs of the bruises on Johnny's upper arms are attached as Exhibit A.

22.     Sarah and Ian brainstormed with her mother and father about what could have caused the bruising on his arms and considered the crib, the exercise saucer, the bath seat, the highchair and the *Evenflo* Johnny Jump Up exerciser.

### B.  The HCJFS Investigation

23.     On October 4th, around 6:45 p.m., caseworker and investigator Christopher Beery arrived at the family home to conduct a surprise home visit.  Beery discussed the allegations, completed a walk-through of the home, and observed Johnny  During the visit, Sarah and Ian showed Beery what could have caused the bruising, including the *Evenflo* Johnny Jump Up.[2]  Beery told Sarah and Ian that their explanations were reasonable, but that he was mandated to return for another home visit on October 10, 2016 to briefly interview Sarah and Ian.  He expressed to them that that would be the end of the investigation.  He complimented Sarah and Ian on how well they were doing as parents.

24.     Around 8:20 p.m. on October 4th, Sarah received a phone call from Beery, explaining that he was mistaken and that after discussing his findings with his supervisor, Joy Swing, they would need to take Johnny to the Mayerson Center for Safe and Healthy Children at CCHMC ("Mayerson Center") for further testing.

25.      The Mayerson Center is a Child Advocacy Center housed at CCHMC that collaborates with many community partners to investigate and treat victims of child abuse and neglect. The Mayerson Center is one piece of the larger child protection system in Hamilton County. Subjects of investigations into child abuse and neglect are regularly sent to the Mayerson Center by employees of HCJFS.

---

[2] A photograph of the Evenflo Johnny Jump Up exerciser is attached as Exhibit B.

26.     Swing took the phone from Beery and threatened Sarah and Ian that if Johnny was not taken to the Mayerson Center by 4:30 p.m. the following day, Swing would call the Hamilton County Prosecutor's Office to initiate legal action to have Johnny taken away.

27.     Sarah and Ian were scared and confused, as they did not understand why such action was necessary.  But they did not want to have their son taken away, so they complied with Swing's instructions.

28.     Per Swing's demands, Sarah and Ian took Johnny to the Mayerson Center. They arrived on October 5, 2016 at 8:00 a.m.  Based on the phone call with Swing, they assumed that the Center would be able to see them.  When they arrived, they were told that appointments were required, that they did not have one, and were directed to take Johnny to CCHMC's emergency department for examination instead.

29.     Around 9:30 am, Johnny was examined by a physician.  Bloodwork was drawn, and Johnny was given a full body x-ray.  The physician described the marks on Johnny's arms as, "pattern bruising" and as "non-accidental trauma" but did not describe the cause of the bruising.

30.     The bloodwork and x-rays did not reveal any concerns or injuries.

31.     Around 1:30 p.m., after Sarah and Ian waited for hours without explanation, Beery and Defendant Swing arrived at the CCHMC Emergency Room.  Swing gave Sarah and Ian an ultimatum:  If they did not agree to a "safety plan," which Swing did not describe, Swing would immediately remove Johnny from their custody and put him into foster care.  Swing did not explain what a safety plan was, but indicated that whether they agreed or not, Johnny was going to be taken from them.

32.     Sarah and Ian became extremely concerned over the ultimatum given to them by Swing.  Ian D. asked to see a warrant.  Defendant Swing claimed she had one but was unable to show it

to them. Plaintiffs later learned Swing lied about having a warrant. Normally, this would be an ex parte emergency order from a judge, reflecting that there was probable cause to remove the child. Swing had no such order at the time.

33.     With no order from a judge to indicate that Swing could take Johnny from them, Sarah and Ian packed up and attempted to leave the hospital, but Swing instructed the security officers to stop them from leaving with Johnny. Two officers blocked their exit. One of them had a hand on his holstered weapon. When the officers saw the small bruises on Johnny's arms, they were confused as to why they needed to stop Sarah and Ian but complied with Swing's instructions.

34.     Sarah and Ian were terrified that their son would be taken from them.

35.     The physician convinced Sarah and Ian to return to the examination room, where an officer was stationed outside the door.

36.     Sarah's mother, a sheriff's deputy, arrived, and Swing's demeanor improved. Swing finally explained the safety plan and indicated that if Sarah and Ian agreed to it, Johnny could stay with a family member instead of a stranger in foster care. Under a safety plan, they would not lose legal custody of Johnny.

37.     Sarah's father called Sarah's cousin to ask him and his wife to take Johnny. Sarah's cousin agreed.

38.     Threatened with a warrant to remove Johnny and the ultimatum that Swing would take Johnny from his parents and place him in foster care, Ian and Sarah signed a safety plan under pressure from Swing.

39.     Johnny was ultimately discharged from CCHMC with instructions "Follow-up in 10-14 days for repeat skeletal survey in Mayerson Clinic. [Johnny] is being discharged with JFS to make safety plan."

C. **Defendant Swing Obtains Emergency Order to Remove Johnny By Making False Statements to the Magistrate.**

40.    On October 4, 2016, after the parents signed the safety plan and Sarah's cousin was on his way to pick up Johnny, Defendant Swing, without notice to the parents, called a Hamilton County Juvenile Court magistrate to request an emergency removal order.

41.    Defendant Swing was overheard by the family telling the magistrate that Johnny had bite marks on his arms.  Based on Swing's false statements that Johnny had bite marks, the magistrate granted the removal order and scheduled the probable cause hearing for the next morning.

42.    The CCHMC physician became aware that Swing was claiming Johnny had bite marks. The physician told Swing that Johnny did not have bite marks and Johnny's medical records from that day never categorized the bruises as bite marks.

43.    In a separate conversation with Sarah and Ian, the physician specifically stated that Johnny did not have bite marks.  In fact, throughout the pendency of the case no evidence was ever produced by Defendants that the bruises on Johnny were bite marks.

44.    Defendant Swing also told the magistrate additional false statements in order to obtain the ex parte emergency order to remove Johnny, including:

    a.    Reasonable notice was given to the parents that the child would be placed in shelter care.  This statement was false since the parents had signed a safety plan believing that placing Johnny with Sarah's cousin would avoid the need for shelter care.

    b.    The child was in immediate danger from their surroundings and removal was necessary to prevent immediate or threatened physical or emotional harm.  This

8

statement is false since the only harm to the child was a healing bruise on each

arm that needed no medical treatment.

    c.   The child had been abused or neglected, or another member of the child's

household had been abused or neglected and the child is in danger of immediate

or threatened physical or emotional harm from that abusive or neglectful person.

This statement is false since the there was no danger of immediate harm to Johnny

and the only harm to the child was a healing bruise on each arm that needed no

medical treatment.

45.    Defendant Swing falsely told the magistrate that there were reasonable grounds to believe

that the child was immediate danger and that removal was necessary to prevent immediate harm

to the child.

46.    Defendant Swing told the magistrate that there were no family members to take Johnny.

Her statement was false. Swing concealed from the magistrate that Sarah and Ian had signed the

safety plan and that Sarah's cousin and her cousin's wife were on their way to pick up Johnny.

47.    Swing told Sarah and Ian that there would be a hearing in the morning, October 6, 2016

at 11 a.m.

48.    Swing removed Johnny from his parents and took him to HCJFS.

49.    That evening Sarah's cousin met with Beery at HCJFS, completed paperwork, and were

fingerprinted. While waiting for the fingerprints to be run, Sarah's cousin spoke with Swing.

She told him that this was not an accident and that someone purposely did this to Johnny. She

said she could not prove it, but she thought it was "bite marks."

50.    Johnny stayed with Sarah's cousin and his wife that night.

**D. <u>False Complaint and Affidavit</u>**

51.     In Swing's complaint to remove Johnny from his parents, filed October 6, 2016, she made numerous knowingly false statements under oath to support a probable cause determination that Johnny was being abused and neglected, including the following:

      a.   "Both Sarah Corso and Ian Denny refused to seek further medical treatment for [Johnny] when requested by the child's nurse and doctor."

         i.   This is directly contrary to what Sarah and Ian told Beery during the home visit. Beery and Swing knew that Johnny had an appointment for the requested bloodwork (and for his six month immunizations) scheduled for October 6, 2016.

      b.   "Ian Denny… stated he would not be taking his child to Children's Hospital for any further testing."

         i.   This is directly contrary to the fact that Sarah and Ian did take Johnny to CCHMC on October 5, 2016, in compliance with Swing's request.

      c.   "After further investigation, it was noted that the bruising on his right arm looked older than the one on the left. Children's Hospital found the bruising to be similar to that of bite marks; however, the doctors were unsure what caused the injuries. The doctors reported that [Johnny] presented with pattern bruising that had been inflicted on him."

         i.   This is directly contrary to the fact that no doctor ever attributed the bruises to be bites or determined that the bruises were of different ages.

         ii.   Swing knew there was no evidence that the bruises were bite marks, as admitted to Sarah's cousin.

    d.  "Both Sarah Corso and Ian Denny… refused to give any explanation for the bruising."

        i.  This is directly contrary to the fact that Sarah and Ian repeatedly suggested ways in which Johnny might have been bruised, including the Johnny Jump Up exerciser.

    e.  "At this time, there are no appropriate family or friends willing and able to take care of the children."

        i.  Swing knew this was untrue, as Swing had spoken Sarah's cousin and his wife at length, Swing knew that HCJFS approved them to take care of Johnny, and Johnny was already in their care at the time the Complaint was filed.

52.    Swing swore to and filed an affidavit in support of the removal Complaint that contained the same knowingly false statements: "Sarah Corso and Ian Denny refused to seek further medical treatment for [Johnny] when requested by the child's nurse and doctor," "Ian Denny… stated he would not be taking his child to Children's Hospital for any further testing," the bruising on his right arm looked older than the one on left" and "Children's Hospital found the bruising to be similar to that of bite marks," "Sarah Corso and Ian Denny… refused to give any explanation for the bruising," and that "[a]t this time, there are no appropriate family or friends willing and able to take care of the children."

### E.  Day One Hearing

53.    On the basis of the false Complaint and Affidavit, a juvenile court magistrate held a Day One Hearing on October 6, 2016.  At that time, on the basis of probable cause established by Defendant's falsehoods, the Court removed Johnny from his parents' custody.  There was no testimony.

54.     Even then the court seemed concerned that there was not much evidence to support the claimed abuse.  The magistrate remarked at the hearing "I guess I'm having a little bit of a hard time from the complaint just understanding what they perceived the severity of the injuries to be."

55.     Despite this, the magistrate accepted Defendant Swing's sworn statements as true and removed Johnny from his parents' custody.

### F.  Cheviot Police Investigation

56.     A Detective from the Cheviot Police Department completed an investigation into the allegations of child abuse.

57.     The Detective conducted interviews with Sarah and Ian and took photographs of Johnny's arms on October 22, 2018.  On the 24th, he also interviewed Sarah's mother.  On November 2, 2018, he contacted Defendant Swing, discussed the matter with her, and requested copies of any medical reports supporting that the bruises were bite marks.  She was unable to produce any.

58.     On November 4, 2018, the Detective sent his report to the Hamilton County Prosecutor's Office with his findings, wherein he concluded that the allegations of child abuse were "unfounded and unsubstantiated."

59.     This was based on the lack of any medical evidence supporting that Johnny was bitten, the lack of any evidence supporting any intentional abuse or neglect by his parents, and the "substantial" reports from consumer agencies that children are injured jumping or flailing their arms against jumper swings.

### G. **HCJFS Requested Continuances**

60.    Another hearing was set on December 7, 2016, but HCJFS asked for a continuance for discovery purposes.

61.    At this time, the court continued to express reservations that there was a case here.  The magistrate remarked that "it doesn't sound like it's a real strong case from the get-go, and the further investigation sounds like it's disconfirming it." He also said "it sounds like at best the evidence is a bit muddy."

62.    At the December hearing, Johnny's guardian ad litem told the court that Johnny was starting to get confused about who his mother was.

63.    Johnny's guardian ad litem filed a dispositional recommendation that it was in Johnny's best interest that he be returned to his parents.  This was based on his parents' cooperation with the investigation and the investigation of the Cheviot Police Department, which determined that Johnny was "not the vict[im] of abuse."

64.    Despite the fact that all non-Defendants, including Johnny's guardian ad litem, believed that Johnny should be returned to his parents, Defendants continued to prevent Johnny from being reunified with his parents and Johnny remained in the custody of the state, being cared for by Sarah's cousin and his wife.  Sarah and Ian were able to have visits with Johnny every day but the visits had to supervised by their cousin.

### H. **Shelter Care Hearing**

65.    On December 12, 2016, the Shelter Care Hearing finally took place.  Sarah and Beery testified.

66.    In addition to their testimony about the events of October 4th and 5th, Sarah testified about the police investigation, which found no evidence of abuse and did not result in any charges.

67.     Beery's testimony further confirmed that HCJFS did not have reason to think Johnny was being abused or in danger of harm and that probable cause did not exist at the time to support it.

68.     He did not testify as to any medical evidence in support of such an interpretation.  In fact, he testified that the physician who examined Johnny, found Plaintiff's explanations for his injuries to be reasonable.

69.     At the shelter care hearing, Johnny's guardian ad litem again told the court it was in his best interest to be returned to his parents because "there's no indication that either parent has abused this child."

### I.     Johnny is Finally Reunited with His Parents

70.     The magistrate ruled on December 20, 2016 that Johnny should be returned to his parents' custody because, in part, a) there was no evidence the bruising was caused by bite marks; b) the complaint filed by Swing suggesting the parents were uncooperative in obtaining a medical evaluation was not accurate since the parents made an immediate medical appointment for follow up "blood work," met with HCJFS caseworker Beery on October 4th, and complied with the request to take the child to the Mayerson Center the next day, cooperated with the police investigation, and the investigations by the child's guardian ad litem and the child's attorney; and c) the allegation in the complaint that the parents refused to provide an explanation for the bruising is not supported by the medical records or testimony.

71.     The magistrate relied on the opinion of the police Detective.  The detective concluded the bruises were not purposeful, there was no medical evidence to support a bite, the bruises did not cause serious risk to the child's health or safety, and there were substantial reports from consumer agencies that exercise jumpers may cause injuries to the arms.

72.     Johnny returned home a few days later.

73.     On the 24th of February 2017, after months of trying to build evidence to support their knowingly false accusations, and being unable to, HCJFS dismissed the complaint.

74.     As a result of Defendants' actions, Sarah, Ian, and Johnny all suffered emotional injury. Johnny was taken from the only home he had ever known, away from the parents who had raised him. This was confusing and disorienting, as he was too young to understand what was happening. He suffered without the familiar presence of his parents to comfort him.

75.     Sarah and Ian suffered distress and embarrassment. It put stress on their family relationships and upended their lives. They spent as much time as possible with Johnny but could not bond with him as parents due to the fact their visits were supervised. They were reduced to mere visitors in his life. This was both a slap in the face to their dignity and roles as his parents, and a reality that meant that they missed milestones in his development. They can never get this time back.

76.     Even now, since Johnny has been returned to their care, they have continued to suffer stress and embarrassment. Taking Johnny to the doctor is excruciating for Sarah and Ian. Every time, they are terrified that their son will be taken from them again, constantly feeling like they are being watched and judged. This has not stopped them from providing medical care. Johnny's health has always come first for them. But as a result of Defendants' actions, every doctor appointment leaves them terrified that instead of getting medical treatment, he will be taken away from them again.

## V. <u>FIRST CAUSE OF ACTION - § 1983 – FIRST AMENDMENT RETALIATION</u>

77.     Defendants, acting under color of law, have violated rights secured to the Plaintiffs by the First Amendment to the United State Constitution, including the right to be free from retaliation for exercising their First Amendment rights.

78.     Plaintiffs engaged in protected activity when they asked Defendant Swing for a warrant.

79.     In response to this protected activity, Defendant Swing took adverse action against them, including making false statements and misrepresenting the facts to the magistrate, instructing security officers at CCHMC to prevent Sarah, Ian, and Johnny from leaving CCHMC, submitting sworn documents to the juvenile court containing false statements and misrepresentations, and refusing to submit a finding that the allegations of child abuse and neglect were unsubstantiated despite there being no credible evidence to confirm any child abuse or neglect occurred.

80.     These actions were motivated at least in part by Plaintiffs' protected conduct.

## VI. SECOND CAUSE OF ACTION - § 1983 – FOURTH AMENDMENT UNLAWFUL SEIZURE

81.     Defendant Swing, acting under color of law, has violated rights secured to the Plaintiffs by the Fourth and Fourteenth Amendments to the United States Constitution, including the right to be free from having custody of their child taken away without probable cause.

82.     Defendant Swing made material false statements knowingly or in reckless disregard for the truth to establish probable cause for Johnny to be taken away, including that the Plaintiffs refused to seek medical treatment for their son, that the bruises were different ages, and were similar to bite marks, that the Plaintiffs refused to give explanations for the bruising, and that there were no family members available to take care of Johnny.

83.     Defendant Swing knew her statements were false or unsubstantiated.

84.     These facts were material to the finding of probable cause by the court.

85.     There was no probable cause to remove Johnny on October 6, 2016, nor were there any exigent circumstances to remove Johnny, meaning Defendant had no reason to believe that life or limb was in immediate jeopardy.

16

86.    As a result, Plaintiffs' son was taken away from them for approximately 76 days and was confused about who his mother was.

## VII. THIRD CAUSE OF ACTION - § 1983 – FOURTEENTH AMENDMENT RIGHT TO FAMILY INTEGRITY

87.    As a result of Defendants' actions, Defendants have, under color of law, deprived all plaintiffs of rights, privileges, and immunities secured to them by the United States Constitution including the right to due process under the Fourteenth Amendment, and specifically their fundamental right to familial integrity and association.

## VIII. FOURTH CAUSE OF ACTION – PROFESSIONAL NEGLIGENCE

88.    Defendant Swing breached her duty of care to Johnny when she lied and made misrepresentations to obtain probable cause to take him away from his parents.

89.    Defendant Swing's conduct was the proximate cause of Johnny's removal from his parents' care, and of Plaintiffs' injury, pain and suffering, and emotional trauma.

## XI. FIFTH CAUSE OF ACTION - LOSS OF CONSORTIUM

90.    The wrongful intentional acts, recklessness, or negligence of Defendant Swing proximately caused Plaintiffs to be robbed of each other's love, society, companionship, affection, comfort, guidance, and counsel.

91.    Plaintiffs Sarah and Ian were denied the filial consortium of their son. Sarah and Ian were unable to spend any unsupervised time with their infant child for 76 days during the most critical time of their son's development. The time they had with their son was very limited and did not promote parent-child bonding. They missed out on crucial months of their young son's development, during which they were unable to feed, care for, and play with their son. They were no longer parents, but merely visitors in his life. They missed milestones of their son's

17

development, such as crawling for the first time, pulling himself up, standing, and introducing

finger foods.

92.    Plaintiff Johnny was denied parental consortium. During crucial months of development,

he was uprooted from the parents and home he knew and loved. He did not benefit from their

love, care, and guidance and became confused as to who his mother was.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award:

    A. Compensatory damages in an amount to be shown at trial;

    B. Punitive damages against the individual defendant in an amount to be shown at trial;

    C. Costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988;

    D. Prejudgment interest; and

    E. Such other and further relief as this Court may deem just and appropriate.

### JURY DEMAND

Plaintiff requests a jury trial on all claims triable to a jury.

Respectfully submitted,

/s/ Jennifer L. Branch
Jennifer L. Branch (0038893)
Trial Attorney for Plaintiff
M. Caroline Hyatt (0093323)
Attorney for Plaintiff
GERHARDSTEIN & BRANCH CO. LPA
441 Vine Street, Suite #3400
Cincinnati, Ohio 45202
(513) 621-9100
(513) 345-5543
jbranch@gbfirm.com
chyatt@gbfirm.com