UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 1:18-cv-00692-WOB-SKB

SARAH CORSO, individually
and as the natural parent and
next friend of John Doe, her
minor child; IAN DENNY,
individually and as the natural
parent and next friend of
John Doe, his minor child;
AND JOHN DOE, a minor.                                          PLAINTIFFS

VS.                  MEMORANDUM OPINION AND ORDER

HAMILTON COUNTY, OHIO;
HAMILTON COUNTY BOARD
OF COMMISSIONERS; AND
JOY SWING, individually and in
her Official Capacity as a Children's
Services Supervisor for Hamilton
County Job & Family Services.                                DEFENDANTS.

This 42 U.S.C. §1983 case arises from the alleged unlawful removal of a child from his family. At their child's six-month checkup, Sarah Corso ("Mother") and Ian Denny ("Father") (collectively "Plaintiffs") relayed concerns to a nurse practitioner about bruising on the child's upper arms. After the exam, the nurse practitioner reported the bruising to the Hamilton County Job and Family Services for neglect or abuse. Ultimately, the Hamilton County Magistrate Court removed the child from the Plaintiffs' care.

The Plaintiffs object to how the Hamilton County Job and Family Services investigator, Joy Swing, handled their case. In their complaint, they allege that Hamilton County, the Hamilton County Board of Commissioners, and Joy Swing (collectively "Defendants") deprived them of

1

their constitutional rights through: (1) First Amendment retaliation; (2) Fourth Amendment unlawful seizure; and (3) Fourteenth Amendment deprivation of parental rights. They also raise state law claims of professional negligence and loss of consortium.

Defendants moved for summary judgment on all claims, arguing that they are entitled to judgment as a matter of law because they are immune from this suit and that there are no genuine issues of material fact. (Doc. 49). Having carefully reviewed the record, the Court concludes that oral argument is unnecessary. The Court, therefore, now issues the following Memorandum Opinion and Order.

### *Factual and Procedural Background*

In October 2016, Mother and Father took their child to his six-month checkup at his pediatrician's office. (Doc. 1 at 4). During the appointment, Plaintiffs directed the nurse practitioner's attention to bruising on the child's upper arms. (*Id.* at 2). The Plaintiffs believed the bruises could have resulted from the child getting his arms caught in the slats of his crib. (*Id.* at 2). But they also confirmed that two dogs resided in the household. (Doc. 49 at 5). After the examination, the nurse practitioner, unbeknownst to Plaintiffs, called Hamilton County Job and Family Services (HCJFS). (Doc. 1 at 4). The nurse practitioner reported that she "noticed some abnormal bruising on the anterior aspect of [the child's] upper arms. [And that] [t]he left arm appeared to maybe be like a squeeze or bite type of a mark with four . . . kind of slightly rounded linear patterns." (Doc. 49 at 5). And she noted that each bruise appeared to be at different stages of healing. (*Id.* at 6).

After about an hour, the nurse practitioner returned to the room and told the Plaintiffs to take the child to Cincinnati Children's Hospital Medical Center to get bloodwork taken to rule out

any potential blood disorder. (Doc. 1 at 4). The Plaintiffs immediately contacted the hospital to make the appointment, scheduling it for two days later. (*Id.*)

Later that day, caseworker, Christopher Berry, arrived at Plaintiffs' home to conduct a surprise home visit. (*Id.* at 5). Berry discussed the allegations with Plaintiffs, completed a walk-through, and observed their child. (*Id.*). Plaintiffs showed Berry what they believed caused the bruising—either the crib, exercise saucer, bath seat, highchair, or the *Evenflo* Johnny Jump Up exerciser. (*Id.*). Despite the Plaintiffs' explanation, Berry told them he needed to return for another home visit. (*Id.*).

Around 8:20 p.m. that night, Plaintiffs received a call from Berry. (*Id.*). He informed them that he discussed the findings with his supervisor, Joy Swing. And because of his conversation with her, he told Plaintiffs that they needed to take the child to the Mayerson Center for Safe and Healthy Children[1] for further testing. (*Id.*). After some initial pushback, Plaintiffs agreed. (*Id.*).

The next morning, Plaintiffs took the child to the Mayerson Center. (*Id.* at 6). When they arrived, they were taken to the emergency department. (*Id.*). There, a physician examined the child, taking bloodwork and x-rays. (*Id.*). The physician described the injury as "pattern bruising" and "non-accidental trauma". (*Id.*).

While the Plaintiffs were waiting, Swing arrived at the hospital and told the Plaintiffs they needed to agree to a safety plan, or HCJFS would have to take the child from their custody. (*Id.*). At this point, the Plaintiffs asked if Swing had a warrant. Swing said she did, but she was unable to show it. (*Id.*). Since there was no court order, the Plaintiffs tried to pack up and leave the hospital, but Swing instructed the security officers to stop them from leaving with the child. (*Id.* at 7). Eventually, the Plaintiffs returned to the examination room. (*Id.*)

---

[1] The organization is a child advocacy center at Children's Hospital. It investigates and treats victims of child abuse and neglect.

When the parents were in the room, Swing explained the safety plan and suggested the child could stay with a relative instead of foster care. (*Id.*). Ultimately, the Plaintiffs signed the safety plan. (*Id.*). At that time, Swing called a prosecutor with the family law division for advice on whether she should request an emergency order because of her perception that the Plaintiffs would not comply with the safety plan based on their initial reluctance. (Doc. 49 at 9). The on-duty prosecutor agreed, so Swing immediately contacted a Hamilton County Juvenile Court Magistrate to request an emergency removal order. (*Id.*). Swing told the magistrate the child had bruises and bite marks. (Doc. 1 at 8). Based on this information, the magistrate issued the order and set it for an *ex parte* hearing the next morning. (*Id.*).

At the *ex parte* hearing, Swing testified over the telephone. Plaintiffs allege that Swing made false statements to acquire the order of removal, such as (1) there was reasonable grounds to believe the child was in immediate harm; (2) there were no family members available to take the child; and (3) the child had bite marks. (*Id.* at 8-9). Additionally, the complaint and affidavit filed by Swing stated: (1) the Plaintiffs refused to seek more medical treatment for their child when requested by the child's nurse or doctor; (2) Father stated he was not taking his child for further testing; (3) Children's Hospital found the bruising similar to bite marks; (4) Plaintiffs refused to give explanations for bruising; and (5) there were no appropriate family or friends willing to care for the child. (*Id.* 10-11). The court granted the order and gave Plaintiffs notice of the order. Meanwhile, HCJFS arranged to find a suitable relative caregiver. (*Id.*). HCJFS identified Mother's paternal cousins as appropriate and placed the child in their care. (Doc. 59 at 9).

The next morning, the court held a hearing. Before it began, the parties revealed they stipulated to temporary custody of the child to HCJFS and the matter was set for adjudication/disposition in December. (*Id.* at 10).

Prior to the December adjudication hearing, a detective from the police department investigated the alleged abuse. (Doc. 1 at 12). On November 4, 2016, the detective sent his report to the Hamilton County Prosecutor's office. In that report, he concluded that the allegations were unfounded and unsubstantiated. (*Id.*). One month later, the Magistrate terminated the HCJFS custody and returned the child to the Plaintiffs. (*Id.*). A few months later, HCJFS dismissed their complaint. (*Id.*).

This case followed. Plaintiffs allege multiple violations of their constitutional rights, along with claims of professional negligence and loss of consortium.

## *Analysis*

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Griffith v. Franklin Cty.*, 975 F.3d 554, 566 (6th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." *Id.* (citation and internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson,* 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment. Instead, there must be evidence on which a trier of fact could reasonably find for the non-moving party. *Rodgers*, 344 F.3d at 595.

Here, the Defendants seek summary judgment on the basis that they are immune from suit. Defendant Swing argues she is absolutely immune from suit because of her role as a social worker. To succeed, she must show:

> The analytical key to prosecutorial immunity, therefore, is *advocacy* –whether the actions in question are those of an advocate. By analogy, social workers are absolutely immune only when they are acting in their capacity as *legal advocates –initiating court actions or testifying under oath* –not when they are performing administrative, investigative, or other functions. The case before us turns on whether the actions of which [the plaintiff] complains were taken by [the social worker] *in her capacity as a legal advocate.*

*Holloway v. Brush,* 220 F.3d 767, 775 (6th Cir. 2000) (emphasis in original). Courts determine whether absolute immunity exists by a functional analysis that looks to "'the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993), (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). Therefore, the key is to determine whether Swing acted as a legal advocate for each of Plaintiffs' claims.

**A. First Amendment Retaliation and Fourth Amendment Unlawful Seizure**

Swing argues she is immune for the alleged false or misrepresented statements in her verified complaint and affidavit and for her removal of the child. She contends her actions to seek

a removal order were taken in her role as an advocate. Swing asserts that the Plaintiffs waived this argument by stipulating to the interim custody at the hearing.² On the other hand, Plaintiffs contend Swing was not acting as an advocate. Instead, they argue that when Swing submitted her statements in the affidavit, she was a complaining witness—who is not entitled to absolute immunity. In support of their argument, they cite to Sixth Circuit precedent, which recognizes that prosecutors have no right to absolute immunity when giving sworn statements as complaining witnesses. *See Cooper v. Parrish*, 203 F.3d 937, 949 (6th Cir. 2000).

That said, the Sixth Circuit has repeatedly held that social workers are absolutely immune for actions that are "intimately associated" with the judicial phase of proceedings relating to the welfare of a child. *Rippy v. Hattaway,* 270 F.3d 416, 422 (6th Cir. 2001); *Salyer v. Patrick,* 874 F.2d 374, 377–78 (6th Cir.1989); *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir. 1984). Two years ago, it held that "[b]ecause a petition for a removal order triggers a subsequent hearing in court, [ ] a social worker's actions as a complaining witness are "more analogous to a prosecutor's decision to prosecute than a police officer's testifying by affidavit in support of probable cause". *Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d at 656, 684-5 (6th Cir. 2018). This Court agrees.

Here, Swing's testimony was given in a court hearing, the purpose of which was to determine whether sufficient cause existed to hold a subsequent hearing as to whether the child should be removed from the home. Swing's testimony falls squarely within the above authority, and she is thus absolutely immune as to those claims.

---

² A plaintiff cannot state a claim of retaliatory prosecution in violation of the First Amendment if the charges were supported by probable cause. *Reichle v. Howards*, 566 U.S. 658 (2012).

7

1. **Swing's Qualified Immunity**

The situation is less clear as to Swing's execution of the removal order. The Court concludes, however, that qualified immunity covers Swing's actions for her execution of the order.

Qualified immunity shields government officials from civil liability when their conduct "does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The burden is on the plaintiff to establish the defendant is not entitled to qualified immunity.

In *Anderson v. Creighton*, the Supreme Court of the United States reaffirmed those principles governing an inquiry into the validity of a defense of qualified immunity: "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, [citation omitted] assessed in light of the legal rules that were 'clearly established' at the time it was taken." 483 U.S.635, 639 (1987). The Supreme Court also explained that the operation of the "objective legal reasonableness" test requires the Court to examine whether a reasonable officer could have believed that the wrongful conduct was lawful, given clearly established law. *Id*. at 641.

Here, the "clearly established constitutional right" was not yet established. In 2018, the Sixth Circuit held that "social workers, like a police officer, cannot execute a removal order that would not have been issued but for known falsities that the social worker provided to the court to secure the order." *Brent*, F.3d 656 at 685.

Even though Swing acted through a court order, the Plaintiffs argue Swing obtained the order through false information, which *Brent* does not permit. The Plaintiffs are, indeed, correct. This was not the law, though, when the removal took place in 2016. The Sixth Circuit rendered

8

*Brent* two years later. And since *Brent* was not controlling law at the time of removal, the constitutional right was not yet "clear" for the standard of qualified immunity.

Yet this distinction does not matter because Swing reported the facts as she knew them to be true. Her testimony showed she knew the injuries were severe enough to warrant medical professionals to urge the Plaintiffs to take the child to the hospital, the Plaintiffs were against going to the hospital, and the medical team disregarded the Plaintiffs' explanations of the cause of the injuries. What is more, the on-duty prosecutor drafted the complaint before Swing discussed the potential placement with the Plaintiffs' cousins, so she did not knowingly falsify a document when it was created.

Also, Plaintiffs argue that the removal of their child, absent a warrant, was a clear constitutional violation under *Kovacic v. Cuyahoga County Dept. of Children Services*, 724 F.3d 687, 698 (6th Cir. 2013). But the facts of this case starkly differ from *Kovacic*.

In *Kovacic*, the court made a distinction between social workers acting in a police capacity rather than as a legal advocate. There, the social worker filled out a Temporary Emergency Care Order ("TEC") with the help of a prosecutor. Once the social worker obtained the TEC order, she took the children without a warrant. By contrast, in this case, Swing discussed the case with a prosecutor and received an *ex parte* emergency court order from a judge. Swing did not act on her own authority. Instead, she relied on a court-order. And the court-order was like an arrest warrant. *See Brent*, 901 F.3d 656, at 696; *Young* v. *Vega*, 574 Fed. Appx. 684, 693 (6th Cir. 2014) (describing an *ex parte* order authorizing the Tennessee Department of Children's Services to take emergency temporary custody of children as "a judicially secured arrest warrant"); *J.B. v. Washington Cty.*, 127 F.3d 919, 930 (10th Cir. 1997) (holding that a judge's "order to take [a child] to a shelter home was tantamount to an arrest warrant issued by a magistrate").

Given these reasons, immunity shields Swing's actions.

## B. Fourteenth Amendment Family Integrity

Plaintiffs do have a fundamental liberty interest under the Fourteenth Amendment for familial association. While this right is clearly established—and, perhaps, one of the oldest fundamental liberties recognized by courts—it can also be outweighed by a compelling government interest to protect children from abuse. *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006).

Here, the Plaintiffs were allowed to contest the removal. All parties, including the child, were represented by counsel. Rather than contesting the removal, the Plaintiffs stipulated to it. There was no testimony given, no requested hearing, and no evidence submitted because the Plaintiffs decided to waive those rights. And the juvenile court has "the ultimate decision-making power with respect to placement and custody[.] [And] it also [can] deprive [a parent] of [their] fundamental right [to family integrity and association.]. *See Pittman v. Cuyahoga County Department of Children and Family Service*, 640 F.3d 716, 728-29 (6th Cir. 2011).

There is no evidence that Swing interfered with Plaintiffs' right to a hearing or coerced them into stipulation. And because of this, it is impossible to hold Swing responsible for the Plaintiffs' inaction. Thus, the Plaintiffs failed to state a claim for which relief can be granted.

## C. County Defendants' Immunity

The County Defendants also raise the affirmative defense of immunity. And while the Plaintiffs extensively argued against Swing's immunity defense, they failed to address the County Defendants' immunity defense.

Failure by a plaintiff to respond to a motion to dismiss constitutes a forfeiture of the claims to which the motion is addressed. *See Notredan, L.L.C. v. Old Republic Exchange Facilitator Co.*, 531 Fed. Appx. 567, 569 (6th Cir. 2013) (holding that a party's failure to respond to an argument that a claim is subject to dismissal "amounts to a forfeiture of [such] claim").

Likewise, opposition to a motion is waived, and dismissal appropriate, when the plaintiff fails to respond to it. *See Allen v. NCL America LLC*, 741 Fed. Appx. 292, 295-96 (6th Cir. 2018) (by failing to respond to motion to dismiss, plaintiff waived their opposition to it); *Humphrey v. United States Attorney General's Office*, 279 Fed. Appx. 328, 331 (6th Cir. 2008) ("[I]f a plaintiff fails to respond or otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion"); *Moody v. CitiMortgage, Inc.*, 32 F. Supp. 3d 869, 875 (W.D. Mich. 2014) ("A plaintiff must oppose a defendant's motion to dismiss or otherwise respond or he waives opposition to the motion").

Since Plaintiffs waived their claims against the County Defendants' immunity defense, the Court finds summary judgment proper.

**D. State Law Claims**

The Plaintiffs' final claims arise under Ohio state law, which falls under this Court's supplemental jurisdiction. Supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966). 28 U.S.C. § 1367 "includes an explicit provision permitting the district court to decline to exercise supplemental jurisdiction when that court has dismissed all of the claims over which it has original jurisdiction." *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 280 (6th Cir. 2000). Because this Court is

granting the Defendants' motion for summary judgment on all federal claims, it declines to exercise supplemental jurisdiction over the remaining state claims.

**IT IS ORDERED** that the Defendants' motion for summary judgment (Doc. 49) be, and is hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.

This 6th day of July 2021.

Signed By:
*William O. Bertelsman* WOB
United States District Judge